**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

VERONICA PIERCE,

                              Petitioner,

v.

SCOTT KERNAN, Secretary, et al.,

                              Respondents.

Case No.  17cv0807-LAB (JLB)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Veronica Pierce (hereinafter "Petitioner") is a state probationer proceeding by and through counsel with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.)  Petitioner was convicted in the San Diego Superior Court of transportation of marijuana and possession of marijuana for sale, and sentenced to 120 days in jail and three years formal probation.  (Pet. at 1-2.)  She claims here, as she did in state court, that she received ineffective assistance of counsel because her trial counsel failed to renew at trial a motion brought at the preliminary hearing to suppress the marijuana based on an illegal search and seizure, which resulted in forfeiture of that claim on appeal (claim one), and that her statement to the police that the parcel she was in the process of shipping when arrested contained "a little bit of weed" was obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and should have been suppressed (claim two).  (<u>Id.</u> at 12-20.)

Respondent has filed an Answer and lodged the state court record. (ECF Nos. 7-8.) Respondent contends claim one is unexhausted because the superior court is the only state court to which it has been presented. (Memo. of P&A in Supp. of Answer ["Ans. Mem."] at 5.) Respondent argues claim one should be denied notwithstanding the failure to exhaust because the superior court's rejection of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Id. at 6-9.) Respondent contends claim two does not provide a basis for relief because the state court determination that Petitioner was not in custody when she made the statement and therefore her Miranda rights were not violated, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Id. at 10-14.) Petitioner has not filed a Traverse.

For the following reasons, the Court finds that although Petitioner failed to present claim one to the state supreme court, the exhaustion requirement is technically satisfied because state court remedies no longer remain available as to that claim, and, alternately, that the Court has discretion to deny the claim notwithstanding a failure to exhaust. The Court finds that habeas relief is unavailable because the state court adjudication of both claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court also finds that any alleged error in the admission of Petitioner's statement is harmless. The Court therefore recommends the Petition be denied.

## I.   PROCEDURAL BACKGROUND

In a two-count Complaint filed in the San Diego County Superior Court on October 10, 2014, deemed to be an Information on January 26, 2015, Petitioner and her co-defendant Tyrone White were charged with transportation of more than 28.5 grams of marijuana in violation of California Health and Safety Code § 11360(a) (count one), and possession for sale of a usable amount of marijuana in violation of California Health and Safety Code § 11359 (count two). (Lodgment No. 1, Clerk's Transcript ["CT"] at 1-3.)

/ / /

Prior to the preliminary hearing, Petitioner's counsel, who represented her at the preliminary hearing and at trial, filed a motion to suppress the marijuana on the basis that because the search and seizure occurred without a warrant it presumptively violated the Fourth Amendment. (CT 4-10.) An evidentiary hearing, at which the arresting officers testified, was held prior to the preliminary hearing. (Lodgment No. 1, Preliminary Hearing Tr. at 5-97.) The motion was denied on the basis that Petitioner was lawfully detained at the time she was asked by an officer if he could open the parcel in her possession which was eventually found to contain marijuana, but was not under arrest, and voluntarily gave consent to open the parcel. (Id. at 97-101.) Defense counsel did not renew that motion at trial, but filed a motion in limine to suppress Petitioner's statement to the arresting officer that there was "a little bit of weed" in the parcel, which she made in response to the officer's comment that he had been watching her and based on his thirty years of experience there was either marijuana or cocaine in the parcel, claiming it was obtained as a result of custodial interrogation without Miranda warnings. (Lodgment No. 2, Reporter's Tr. ["RT"] at 18.) The trial judge conducted a pre-trial evidentiary hearing at which the arresting officers again testified, and denied the motion on the basis that Petitioner's statement was not made in response to custodial interrogation because she was not in custody at the time, and because she volunteered the statement in response to the officer's observation, not as a result of questioning. (RT 25-39.) On April 16, 2015, a jury found her guilty on both counts. (CT 175-76.) On May 15, 2015, she was sentenced to 120 days in custody and three years formal probation. (CT 178.)

Petitioner appealed, challenging the denial of her motions to suppress the marijuana and to suppress her statement. (Lodgment Nos. 3-5.) The appellate court affirmed, finding that Petitioner had forfeited a challenge to the motion to suppress the marijuana by failing to re-raise it at trial, and that the trial court had properly denied the motion to suppress her statement because she was not in custody when she made the statement. (Lodgment No. 6, People v. Pierce, No. D068218, slip op. (Cal.App.Ct. May 10, 2016).) She raised the same claims in a petition for review in the state supreme court. (Lodgment No. 7.) That

court denied the petition in an order which stated, "The petition for review is denied." (Lodgment No. 8, <u>People v. Pierce</u>, No. S235161, order at 1 (July 20, 2016).)

On August 10, 2016, Petitioner filed a habeas petition in the state superior court in which she raised claim one here, arguing that she received ineffective assistance of trial counsel due to counsel's failure to re-raise the preliminary hearing marijuana suppression motion at trial, which resulted in forfeiture of the challenge to the denial of that motion on appeal. (Lodgment No. 8.) The superior court denied the petition on September 23, 2016, finding that Petitioner had not received ineffective assistance of counsel because had trial counsel renewed the motion to suppress in the trial court it would have been denied for the same reason it was denied at the preliminary hearing. (Lodgment No. 9, <u>In re Pierce</u>, No. HC22587, order (Cal.Sup.Ct. Sept. 28, 2016).)

## II.  **TRIAL PROCEEDINGS**

Don Clark, a Chula Vista Police Detective, testified that he is assigned to the Parcel Interdiction Team of the Regional Narcotics Task Force for the United States Drug Enforcement Administration, whose primary responsibility is to investigate people who ship narcotics across the country in parcels through carriers such as UPS, FedEx, DHL and the United States Post Office. (RT 67-69.) He testified that narcotics are shipped from San Diego to other parts of the country every day, and that the value increases proportionately to the distance from San Diego, so that a pound of marijuana worth about $400 in San Diego is worth about $1200 in New York. (RT 69-71.)

On October 8, 2014, Detective Clark was conducting surveillance at the Postal Annex in Lemon Grove, California, which his team calls the "fishing hole" because the shipping of narcotics is so prevalent there. (RT 72-74.) Detective Clark's attention was drawn to a man, later identified as Petitioner's co-defendant Tyrone White, leaving the Postal Annex with flattened cardboard boxes and packing peanuts, which he placed in the truck of his car while Petitioner stood outside the passenger side of the car. (RT 74-75, 80.) Detective Clark's team decided to follow the car, which drove to a United States Post Office where White was seen leaving with a flattened cardboard box. (RT 77-79.) White

then drove to his residence, arriving about 2:50 p.m., and the team set up surveillance parked on a street across a canyon from the house.[1]  (RT 79-82.)

White parked in his garage, which is detached from his house, and during the ensuing two hours made five to ten trips between his home and the garage, including carrying a large ball of cellophane.  (RT 79-85, 107.)  Petitioner never entered the garage, but stayed inside the house until, about 4:40 p.m., White drove them both to a FedEx store on 47th Street.  (RT 86, 117-18.)  Detective Clark explained that cellophane is used to wrap narcotics to prevent the smell from escaping, and that the 47th Street FedEx store is a shipping hub which sends its parcels directly to the airport in the late afternoon.  (RT 86-87.)  He said that narcotics traffickers typically wait to bring parcels to the shipping center near the time of the last shipment so the parcels do not sit in the store all day, because the smell of narcotics can eventually permeate the packaging.  (Id.)

When Petitioner and White arrived at the 47th Street FedEx store, Petitioner exited the passenger side of the vehicle carrying a parcel, with White following her at a short distance carrying his own parcel.  (RT 88-89.)  White appeared to become suspicious and looked at the officers, so Detective Clark approached him, identified himself as a police officer, said he was a member of the Parcel Interdiction Team, and asked if he would mind talking about the package he was about to ship.  (RT 90.)  While Detective Clark was speaking to White, he observed other officers from his team exit the store with Petitioner and open her parcel, which contained 11.3 pounds of marijuana.  (RT 91-92.)  Petitioner's purse contained $13,500 in cash and a stub from an airline ticket from New York to San Diego the previous day.  (RT 95-97.)  The value of the marijuana in her parcel was about $4000 in San Diego and about $12,000 in New York.  (RT 97-98.)  Detective Clark said the team went to White's house where he gave consent to search his house and his parcel.  (RT 98.)  They found 11.7 pounds of marijuana in his parcel, and 13.7 pounds of marijuana

---

[1]  At the preliminary hearing motion to suppress, Detective Clark testified that he was parked about 100 yards from White's house using binoculars and a long-lens camera to watch the house, although he was able see it with his naked eye.  (Lodgment No. 1, Preliminary Hearing Tr. at 31.)

17cv0807-LAB (JLB)

in his garage, along with materials used in packaging narcotics for mailing. (RT 99-102.) The total marijuana recovered, 36.7 pounds, is worth about $12,845 in San Diego, very close to the amount of cash recovered from Petitioner, and worth about $36,700 in New York. (RT 99-101.) Petitioner consented to a search of her hotel room, but no evidence was found. (RT 111-13.)

John McGill, a San Diego Police Narcotics Detective, testified that he is a member of the Commercial Interdiction Team of the Drug Enforcement Administration assigned to identify individuals who ship narcotics through the mail or postal services. (RT 121.) On October 8, 2014, about 2:30 p.m., he was on duty at the Postal Annex in Lemon Grove where he observed Petitioner and her co-defendant White standing next to White's car. (RT 122-24, 127.) His team followed them to a residence, and then to a FedEx store on 47th Street. (RT 125-26.) It appeared to Detective McGill that as White was walking into the FedEx store he become aware of the police presence, so the team decided to make contact with White and Petitioner. (RT 127.)

Detective McGill went inside the store where he observed Petitioner at the counter "appear[ing] to be filling out a shipping label." (RT 127-28.) He identified himself as a police officer, showed her his badge but not his gun, said, "Let's go outside and talk to your friend," and took the parcel and walked outside. (RT 128, 137-38.) Petitioner followed him outside where he asked what her relationship to White was, and she replied they were friends, but when asked his name, "she couldn't provide the name." (RT 128-29.) Detective McGill said she looked extremely nervous, much more so than an average person approached by the police, and that she kept looking at White and was vague with her answers when asked what she had been doing that day. (RT 129, 143.) After Petitioner produced a New York identification card, Detective McGill told her he had years of experience, that he had been watching her, and that he suspected her parcel contained marijuana. (RT 130.) Petitioner "really didn't say anything. She kind of shook her head in the 'no' fashion." (Id.) Detective McGill then said to her, "Well, whatever is in here, if it's not marijuana, then it's cocaine." (Id.) Petitioner replied, "No. It's a little bit of weed."

17cv0807-LAB (JLB)

(Id.)  He asked for her consent to open the parcel, which she gave, and he opened it and found two or three heat-sealed packages containing 10 or 11 pounds of marijuana.  (RT 130-31, 133.)  He then arrested Petitioner and searched her person and personal belongings.  (RT 131.)  In her purse he found an airline ticket stub from the previous day from New York to San Diego, an envelope containing $13,500 in brand new crisp $100 bills, and a key from a hotel in San Ysidro.  (RT 131-32.)  A forensic chemist with the Drug Enforcement Administration testified that the material in the parcels was marijuana.  (RT 144-53.)  The People rested.  (RT 156.)

Petitioner testified that she is a registered nurse and a former real estate agent who owns and lives in a multi-unit residence in the Bronx, New York.  (RT 158.)  She has six tenants in her building who pay her their rent in cash, about $4000 per month total, and a rental house in Florida which generates $950 per month by check.  (RT 159.)  She also receives a paycheck from her nursing job, which she cashes rather than deposits in a bank, and carries her money around with her in cash rather than putting it in a bank, because her parents never had a bank account and "that's just how I was brought up."  (RT 160-61.)

Petitioner testified that she came to San Diego on a one-way ticket on October 7, 2015, hoping to relocate here to avoid the cold winters in New York.  (RT 163.)  She met her co-defendant White in Georgia a couple of years earlier, and although they had remained friends she did not "know the intricate details of his life."  (RT 164-65.)  She got in touch with him hoping he would show her around San Diego and help her find an apartment.  (RT 165.)  White picked her up at her hotel about noon on October 8, and said he had some errands to run before he could show her around.  (RT 165-66.)  He drove to a Postal Annex store and then to a post office before driving to his house, and she stayed in the car each time he went inside the stores.  (RT 166-68.)  When they arrived at his house, he went into the garage and she went directly into the house, where she sat in the living room watching television while he remained in the garage.  (RT 168-69.)  The garage is separate from the house, and although he came and went occasionally she did not know what he was doing and did not smell anything.  (RT 169-70.)

Eventually, he told her he had one more errand to run and they left in his car.  (RT 170.)  White then drove them to a FedEx store where he gave her a parcel which "he said had books or something that he was going to ship to some friend," and asked her, "Can you please help me bring this inside."  (RT 171, 174.)  She was standing inside the store with the parcel waiting for White, and was not filling out a shipping label, when a police officer approached her and lifted his shirt revealing his gun and badge.  (RT 171-73.)  She did not know what was going on, and when the officer asked her what was in the box, she said, "I don't know."  (Id.)  She was frightened because she had never been in such a situation before, and denied telling the officer that the box contained a little bit of weed.  (RT 173-74.)  She said Detective McGill told her, "I've been doing this my whole life, and if it's not weed in there, it's cocaine," and asked if he could open the box.  (RT 174.)  She told him, "Sure.  It's your job."  (Id.)

Petitioner testified that she brought the $13,000 in cash with her from New York, which she intended to use to pay the $2200 mortgage on her New York building, the $850 mortgage on her Florida house, purchase an airline ticket to visit her grandchildren in Nevada or return to New York, and to possibly put a down payment on an apartment in San Diego and buy furniture.  (RT 176-77, 180.)  She said she has been working two jobs most of her life and makes a fairly good income as a nurse, that she is in the habit of carrying her money on her rather than keeping it in a bank, that she changes her cash into new $100 bills whenever she has a chance, and that she did not come to San Diego for the purpose of shipping marijuana back to New York.  (RT 178-80.)  The defense rested and there was no rebuttal evidence offered.  (RT 189-90.)

After deliberating about a day and a half, during which Petitioner's testimony was read back, the jury found her guilty of transporting more than 28.5 grams of marijuana, and guilty of possession for sale of a usable amount of marijuana.  (RT 171-76.)  Petitioner was sentenced to 120 days in custody and three years formal probation.  (RT 276.)

/ / /

/ / /

## III.    **DISCUSSION**

Petitioner claims that her federal constitutional rights were violated because she received ineffective assistance of counsel when her trial counsel failed to renew at trial the preliminary hearing motion to suppress the marijuana, which resulted in forfeiture of a challenge to the denial of that motion on appeal (claim one), and that her statement to the police that her parcel contained "a little bit of weed" was erroneously admitted at trial because it was obtained as a result of custodial interrogation without Miranda warnings (claim two).  (Pet. at 12-20.)

Respondent contends that claim one is unexhausted because it was presented only to the superior court in a habeas petition, never to the state supreme court, but argues it should be denied notwithstanding the failure to exhaust because the superior court's rejection of the claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 6-9.)  Respondent argues that the state court determination that Petitioner was not in custody when she made her statement and therefore her Miranda rights were not violated, is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Id. at 10-14.)

### A.    **Standard of Review**

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006).  Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth

in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy § 2254(d)(2), the petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.    Claim One**

Petitioner first claims that she received ineffective assistance of counsel when her trial counsel (Petitioner was represented by the same attorney at the preliminary hearing and at trial), failed to renew at trial the preliminary hearing motion to suppress the marijuana. (Pet. at 12-15.) Petitioner claims here, as she did at the preliminary hearing motion, that the actions of the officers in watching her with binoculars and a long-lens camera violated her Fourth Amendment rights because the use of such optical enhancement techniques was unreasonable, and therefore did not support the finding of reasonable suspicion needed for a lawful detention. (Id.) The only state court to which this claim was presented is the state superior court, in a habeas petition. (Lodgment No. 9.) The superior court denied the petition, stating:

> Petitioner claims her trial counsel was ineffective for failing to preserve the legality of the detention as an issue on appeal by not raising the issue concerning the surveillance with the trial court. "When a defendant claims ineffective assistance of counsel based on his counsel's failure to bring a motion to suppress evidence on Fourth Amendment grounds, the defendant is

required to show that the Fourth Amendment claim had merit." (*People v. Frye* (1989) 18 Cal.4th 894, 989, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal. 4th 390.) "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 287.) Additionally, "(t)he Sixth Amendment does not require counsel 'to waste the court's time with futile or frivolous motions.' (Citation.)" (*People v. Memro* (1996) 11 Cal.4th 786, 834, internal quotations omitted.) Although the Court of Appeal concluded that petitioner failed to preserve the issue of legality of her detention for appeal, "(l)ike pouring alkali on acid, raising the issue of ineffective assistance of counsel neutralizes *Lilienthal* waiver" and requires a review of the lawfulness of the search or detention. (*Hart, supra*, 74 Cal.App.4th at 486.) That being the case, this court reviewed the legality of the detention based on petitioner's argument that the surveillance conducted by Officer Clark was unlawful thereby rendering the detention illegal.

Petitioner argues that her detention was unlawful because the surveillance conducted by Officer Clark, which formed the reasonable suspicion to detain her, violated her reasonable expectation of privacy. She takes issue with Officer Clark's use of binoculars and a long-lens camera when he was conducting surveillance of petitioner prior to the detention. Petitioner claims that Officer Clark's "use of enhanced techniques" to observe her violated her right to be free from unreasonable search, "because her movements were not readily visible to the naked eye of the observer." (See Petition at 17:9-18.) Petitioner admits that although she "did not seek to hide herself from public view when she traveled on public highways and entered buildings open to the public, she did not relinquish her right to be free from unreasonable search and seizure simply because she was visible to the public." (See Petition at 16:20-24.) Thus, she claims Officer Clark's use of binoculars and a camera while conducting his surveillance violated her Fourth Amendment right because it was beyond the scope of permissible and reasonable surveillance and cannot be used to form the reasonable suspicion needed to lawfully detain her.

Petitioner's argument is without merit and a motion to suppress or a renewed suppression motion would have been denied in the trial court. "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not subject of Fourth Amendment protection." (*Katz v. United States* (1967) 389 U.S. 347, 351.) "But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (*Ibid.*) The test to determine the validity of surveillance depends on "whether that which is perceived or heard

17cv0807-LAB (JLB)

is that which is conducted with a reasonable expectation of privacy and not upon the means used to view it or hear it." (*People v. Arno* (1979) 90 Cal.App.3d 505, 511.) "So long as that which is viewed or heard is perceptible to the naked eye or unaided ear, the person seen or heard has no reasonable expectation of privacy in what occurs. Because he has no reasonable expectation of privacy, governmental authority may use technological aids to visual or aural enhancement of whatever type available." (*Ibid.*) Furthermore, it has long been established that "if the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid, there is no unconstitutional intrusion." (*Burkholder v. Superior Court* (1979) 96 Cal. App.3d 421, 426.)

The observations of petitioner and her co-defendant which Officer Clark testified to at the preliminary hearing were made while the two were in public and were visible to the naked eye. Initially, Officer Clark and his team were conducting surveillance at the Postal Annex located at 7107 Broadway in Lemon Grove, which is a known location for narcotic shipments. Prior to petitioner and her co-defendant's arrival at the subject Postal Annex, Officer Clark had been conducting surveillance at that location for approximately an hour. He was parked in the strip mall across the street from the Postal Annex, which he testified was approximately 150 away. Officer Clark testified that he believed he took a photograph of petitioner as she was standing outside the passenger side of co-defendant's vehicle in the Postal Annex parking lot. According to Officer Clark, it was co-defendant's action of leaving this particular Postal Annex with shipping equipment which caught his attention and which caused him to decide to follow the two to their next location.

Consistent with Officer Clark's experience with narcotic shipments, petitioner and co-defendant were observed traveling to another postal service location; the U.S. Post Office at 5505 Stevens Way. There, Officer Clark parked in the same parking lot as petitioner and co-defendant. Office Clark testified that he took photographs of the co-defendant as he went inside the post office, when the co-defendant exited the post office with additional packaging material, and when the co-defendant loaded the packaging material into his car. Officer Clark testified that he parked one block over, on 69th Street in San Diego, where he was elevated above co-defendant's residence and had an unobstructed view of the house. He estimated he was parked approximately 100 feet away from the residence. He conducted surveillance at the residence for over an hour and a half and observed, with the aid of his binoculars and camera, co-defendant come in and out of the house and opening and closing the garage door. He also observed the co-defendant come

out of the residence or garage with cellophane, one of the most common items used to wrap large commercial quantities of narcotics. Officer Clark testified that petitioner was inside the house the entire time he conducted surveillance of the co-defendant's residence.

Then, around 4:30 p.m., Officer Clark observed petitioner and her co-defendant leave the residence. He followed them to their next destination, which was to the FedEx store on 47th Street in San Diego. There, Officer Clark observed petitioner enter into the store while he was "out on the road." He then entered the FedEx parking lot and parked a couple of stalls away from co-defendant's car. Officer Clark testified that based on Officer Clark's extensive experience with narcotic shipments and his observations of co-defendant and petitioner, he formed a reasonable suspicion that co-defendant and petitioner were going to ship a narcotic parcel. Contact was made with petitioner by Officer McGill inside the FedEx store while Officer Clark made contact with co-defendant in the parking lot of the store.

Based on the evidence presented at the preliminary hearing, it was clear that Officer Clark's use of an optical aid by way of the binoculars and/or camera did not violate petitioner's reasonable expectation of privacy. This is because, under the circumstances, no privacy rights could have reasonably existed while petitioner was out in the public and viewable to the naked eye. Additionally, there was no evidence that the binoculars and/or camera were used to see what petitioner or her co-defendant were doing inside his house. Officer Clark did not provide any testimony regarding any actions petitioner may or may not have done while in co-defendant's residence. Without any evidence that officer Clark used the binoculars and/or camera to see Petitioner's movements and actions while inside co-defendant's home, petitioner has merely asserted an assumption that the devices were used to infringe on her privacy rights, which is unsupported by the evidence. Nor was there any evidence that Officer Clark used the binoculars and/or the camera to see what petitioner or her co-defendant were doing while inside co-defendant's car. Thus, to the extent petitioner had a reasonable expectation of privacy while inside co-defendant's house or in his car, there was no evidence of any Fourth Amendment violation through Officer Clark's use of the binoculars and/or camera.

Instead, the evidence established that the binoculars and camera were used to simply aid what Officer Clark was already witnessing with his naked eye while petitioner and her co-defendant were in the public. Based on evidence at the preliminary hearing, it appeared that at most, Officer Clark was only 150 feet away from petitioner when he used the optical aids to assist

his surveillance. Other times he was either 100 feet away, in the same parking lot, or parked in a few parking stalls away from petitioner. The fact that Officer Clark's observations were aided by the use of binoculars or a camera at certain points during the surveillance does not in and of itself equate to a Fourth Amendment violation as petitioner suggests. The activity that Officer Clark testified he observed through the binoculars and camera were observable to people not using an optical aid.

Thus, a motion to suppress or renewed motion based on petitioner's argument, had one been brought before the trial court, would have lacked merit and would have been denied. Because petitioner would not have prevailed on a motion to suppress or a renewed suppression motion, she has not established that her counsel was ineffective and that she was deprived of her Sixth Amendment right to effective assistance of counsel.

(Lodgment No. 10, In re Pierce, No. HC22587, order at 4-8.)

Claim one was not presented to any other state court. Petitioner raised a claim in the appellate and supreme courts on direct appeal arguing that the motion to suppress the marijuana was erroneously denied because the use of binoculars and a long-lens camera constituted an illegal search. (Lodgment Nos. 5, 7.) The state supreme court summarily denied the claim, and the appellate court found it had been forfeited due to trial counsel's failure to re-raise it at trial, explaining that an order denying a preliminary hearing suppression motion is not appealable unless it is renewed at trial because a magistrate conducting a preliminary hearing does not sit as a superior court judge. (Lodgment No. 6, People v. Pierce, No. D068218, slip op. at 5-7.)

In order to exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition. 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). The petitioner must have raised the very same federal claims brought in the federal petition before the state supreme court. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995); Picard v. Connor, 404 U.S. 270, 275-76 (1971) (in order to exhaust state judicial remedies, a claim must be "fairly presented" to the highest state court, that is, in a manner which allows that court to have "the first opportunity to hear the claim

sought to be vindicated in a federal habeas proceeding.") Accordingly, Petitioner did not satisfy the exhaustion requirement by presenting his ineffective assistance of counsel claim only to the state superior court.

Nevertheless, the exhaustion requirement is satisfied "if it is clear that (the habeas petitioner's) claims are now procedurally barred under (state) law." Gray v. Netherland, 518 U.S. 152, 161 (1996); Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because a return to state court for exhaustion would be futile.") Petitioner filed her habeas petition in the state superior court on August 10, 2016, over a year ago, and has never presented her claim to the state supreme court. California law required her to present the claim to the state supreme court without substantial delay. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied); Evans v. Chavis, 546 U.S. 189 (2006) (noting that substantial delay under California law does not differ significantly from the rule in other states which use 30 to 60 day rules, and that a six-month unexplained delay was presumptively unreasonable); In re Clark, 5 Cal.4th 750, 797-98 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied.")

Because it is clear that Petitioner no longer has state court remedies available to her, the claim is considered to be technically exhausted. Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him."), quoting Coleman v. Thompson, 501 U.S. 722, 732 (1991); Phillips, 267 F.3d at 974 ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'") Such a

technically exhausted claim is procedurally defaulted in this Court. <u>Coleman</u>, 501 U.S. at 735 n.1 (holding that "there is a procedural default for purposes of federal habeas" when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); <u>see</u> <u>id.</u> at 729-30 (holding that a procedural default arises from a violation of a state procedural rule which is independent of federal law and is clearly established and consistently applied.) The Supreme Court has held that California's timeliness rule is clearly established and consistently applied. <u>Walker</u>, 562 U.S. at 312-21. It is also independent of federal law. <u>See</u> <u>Bennett</u>, 322 F.3d at 581 ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground.")

The Court may reach the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for her failure to satisfy the state timeliness rule and prejudice arising from the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. <u>Coleman</u>, 501 U.S. at 750. Petitioner has not attempted to meet those requirements, and has not addressed Respondent's contention that claim one is unexhausted. Nevertheless, the Court need not address whether Petitioner could make a showing sufficient to excuse the default because claim one is clearly without merit. The Ninth Circuit has indicated that "[p]rocedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002), citing <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.") Because claim one clearly fails on the merits, the Court finds that the interests of judicial economy support denying claim one on the merits without addressing whether Petitioner can overcome the procedural default.

Alternately, even assuming state court remedies remain available to Petitioner regarding claim, in which case Petitioner's claims would be unexhausted, the Court has discretion to deny the claim notwithstanding any failure to exhaust. <u>See</u> 28 U.S.C.

§ 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")  Because claim one clearly fails on the merits, the outcome is the same whether the claim is unexhausted or technically exhausted.

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). For ineffective assistance of counsel to provide relief, Petitioner must show that counsel's performance was deficient.  Id. at 687.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  She must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable."  Id.  To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel.  Id. at 687.  "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  "The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so."  Richter, 562 U.S. at 105.  These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Prior to the preliminary hearing, defense counsel filed a motion to suppress the marijuana, which was joined by Petitioner's co-defendant, arguing that the seizure of Petitioner and the search of her parcel were presumptively unreasonable because they occurred without a warrant, and that the burden was on the prosecution to justify the search and seizure.  (CT 4-10.)  A hearing was held at which Detectives McGill and Clark testified consistently with their trial testimony.  (Lodgment No. 1, Preliminary Hearing Tr. at 2-

101.)  Defense counsel argued that a reasonable person would not have felt free to leave after Detective McGill identified himself as an officer, told Petitioner he had been watching her and that based on his experience he thought there was cocaine in her parcel, and said, "Let's go outside."  (Id. at 86-89.)  The preliminary hearing judge stated:

> With regard to Ms. Pierce, Officer McGill's testimony that his contact with Pierce was inside the FedEx and he said, "let's go outside," I'm giving the defendant the benefit of the doubt.  As I indicated, that sounds more like a command than a question, and so I believe she was detained at that point. She placed the box on the ground, she appeared nervous, and, of course, police are allowed to consider nervousness and vague responses to answers.  He told her he'd been observing her, believed she was shipping drugs, asked if he could open the box two times, and she said yes two times.
>
> So she was asked a question at a time where I believe she was lawfully detained based on all the activity that occurred earlier in the day, and, therefore, I believe the consent was voluntarily given and that there was no violation of either defendants' Fourth Amendment rights, so the motions are respectfully denied at this time.

(Id. at 101.)

In order to show that defense counsel was deficient in failing to renew that motion at trial, Petitioner must show the error was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  Defense counsel, who represented Petitioner at the preliminary hearing and at trial, filed an in limine motion to suppress her statement in the trial court but did not renew the motion to suppress the marijuana.  (CT 28-30.)  Petitioner is required to overcome a strong presumption that counsel's failure to seek suppression of the marijuana in her trial court motion to suppress the statement was a reasonable tactical decision.  See Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect."), citing Strickland, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment); and Massaro v. United States, 538 U.S. 500, 505 (2003) (noting

that the presumption of competence has particular force where a claim is based solely on the trial record). Petitioner has not overcome that presumption. As defense counsel observed in her written motion papers: "The defense is entitled to await a justification(s) put forth by the prosecution [for not procuring a warrant] . . . [and] is then entitled to submit a response, either orally, in writing, or both, detailing why that justification may be inadequate." (CT 8.) The motion to suppress the marijuana was then litigated at the preliminary hearing, where both detectives testified and were cross-examined by defense counsel. As discussed below, that testimony established that the surveillance by the officers occurred in public areas without intrusion into any area where Petitioner might be considered to have had a reasonable expectation of privacy, and that her consent to search her parcel, as with her statement that it contained "a little bit of weed," were given voluntarily and not in response to custodial interrogation. Thus, the motion to suppress the marijuana, although perhaps of uncertain merit prior to the preliminary hearing and the testimony of the officers due to a presumption that a warrantless search and seizure violates the Fourth Amendment, turned out to be unavailing. However, Petitioner has failed to overcome the presumption that once counsel litigated the motion to suppress the marijuana at the preliminary hearing, which included cross-examination of the officers, counsel made a reasoned professional judgment not to renew it at trial. As discussed below, that presumption is buttressed by the finding that there is no reasonable probability that counsel would have prevailed on a renewed motion in the trial court. Accordingly, the state court finding that Petitioner failed to show deficient performance is not based on an unreasonable determination of the facts, and is neither contrary to, nor does it involve an unreasonable application of, <u>Strickland</u>. In addition, assuming Petitioner could demonstrate defense counsel was deficient in failing to preserve the claim for appeal, the Court also finds that it was objectively reasonable for the state court to find she did not establish prejudice. <u>See</u> <u>Strickland</u>, 466 U.S. at 687 (a petitioner must establish both deficient performance and prejudice in order to establish constitutionally ineffective assistance of counsel). As the state superior court noted, Detective Clark's observations, although aided by the use of

binoculars and a long-lens camera, could have been made without the use of optical aids, and therefore did not intrude on any area in which Petitioner had a reasonable expectation of privacy. The Supreme Court has observed: The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." United States v. Jones, 565 U.S. 400, 406 n.3 (2012). By reason of our decision in Katz v. United States, 389 U.S. 347 (1967), property rights "are not the sole measure of Fourth Amendment violations," Soldal v. Cook County, 506 U.S. 56, 64 (1992) – but though Katz may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government *does* engage in (a) physical intrusion of a constitutionally protected area," United States v. Knotts, 460 U.S. 276, 286 (1983) (Brenan, J., concurring in the judgment). Florida v. Jardins, 569 U.S. 1, ___, 133 S.Ct. 1409, 1414 (2013); Katz, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.") (citations omitted). The uncontroverted evidence showed that the officers were parked across the street from the Postal Annex when they first observed Petitioner standing next to White's car in the Postal Annex parking lot, that they followed White's car to a post office and then to his house along public roads, they parked on a public street 100 yards away, waited and watched as White came and went between his house and garage while Petitioner was out of sight inside the house, and then followed them to the FedEx store and observed Petitioner enter the store carrying a parcel. Petitioner has failed to demonstrate that the police officers intruded into any area in which she might have had a reasonable expectation of privacy. See California v. Ciraolo, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'"), quoting Katz, 389 U.S. at 360. "Private commercial property is not one of the enumerated items that the Fourth Amendment protects." Patel v. City of Montclair, 798 F.3d 895, 898 (9th Cir. 2015) (holding that no search within the meaning of the Fourth Amendment

occurs when police officers enter commercial areas open to the public). Thus, it was objectively reasonable for the state court to find that Petitioner had failed to show how the officers' observations of her movements out in public intruded upon a reasonable expectation of privacy. See Katz, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.") For those reasons, and for the reasons discussed below in claim two why Petitioner's statement was not obtained as a result of custodial interrogation, the Court finds that even assuming Petitioner could demonstrate deficient performance from trial counsel's failure to preserve the issue for appeal, she has not shown "a probability sufficient to undermine confidence in the outcome," and has therefore failed to satisfy the prejudice prong. Strickland, 466 U.S. at 694. It was therefore objectively reasonable for the state superior court to deny Petitioner's ineffective assistance of counsel claim on the basis that: "Because petitioner would not have prevailed on a motion to suppress or a renewed suppression motion, she has not established that her counsel was ineffective and that she was deprived of her Sixth Amendment right to effective assistance of counsel." (Lodgment No. 10, In re Pierce, No. HC22587, order at 7-8.)

In sum, the Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court recommends denying habeas relief as to claim one on that basis because the interests of judicial economy counsel in favor of reaching the merits of the claim irrespective of whether the claim is unexhausted or is technically exhausted and procedurally defaulted.

## D.     Claim Two

Petitioner contends in claim two that her statement to the police that the box she carried into the FedEx store contained "a little bit of weed" was obtained in violation of Miranda, and was therefore erroneously admitted at trial. (Pet. at 15-20.) Respondent answers that the determination by the state court that Petitioner's Miranda rights were not

violated because she was not in custody when she made her statement, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Ans. Mem. at 10-14.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-06 (1991) (emphasis added). The Court will look through the silent denial of Petitioner's petition for review by the state supreme court to the last reasoned decision regarding this claim, the state appellate court opinion on direct appeal, which stated:

> The principal issue on appeal is whether Pierce was "in custody" at the time of her incriminating statement regarding the weed. If so, then McGill's failure to have given Pierce *Miranda* warnings requires a reversal of the order denying the motion to suppress; if not, then the trial court properly denied the motion.

> 1. *Law*

> In *Miranda, supra,* 384 U.S. 436, 444, the United States Supreme Court imposed constitutional limitations—which the Court described as "procedural safeguards effective to secure the privilege against self-incrimination"—on police authority to conduct a custodial interrogation of a suspect. Our state high court summarized these safeguards as follows: """(B)efore being subjected to 'custodial interrogation,' a suspect 'must be warned he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'""" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*), quoting from *Miranda,* at p. 444.) Evidence obtained in violation of these safeguards is "constitutionally inadmissible." (*Miranda,* at p. 440.) Stated differently, "(a)bsent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)

> To determine whether Pierce was "in custody" at the time of her incriminating statement, the test is "whether a reasonable person would have felt he or she was at liberty to leave (either the FedEx store or the parking lot) or to decline (McGill's) request( ) to go (outside) and be interviewed there." (*Kopatz, supra,* 61 Cal.4th at p. 80; see *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663 ("'would a reasonable person have felt he or she was not at

liberty to terminate the interrogation and leave'"").)  If a reasonable person in Pierce's position would not have felt she was at liberty to leave, then the evidence from Pierce's interview in the parking lot is inadmissible, because it was obtained from a *person* who was unlawfully "seized in violation of the Fourth Amendment"—i.e., in custody without the benefit of the safeguards that result from not being told her rights against self-incrimination under *Miranda.*  (*Kopatz,* at p. 80.)

In ruling on a defendant's motion to suppress evidence based on a Fourth Amendment claim, the trial court finds the historical facts, selects the appropriate law and applies it to the facts to determine whether there has been a violation of law.  (*Kopatz, supra,* 61 Cal.4th at p. 79.)  On appeal, we review the factual findings for substantial evidence and the application of the law to those facts de novo. [Footnote: Without authority, Pierce contends that the standard of review is abuse of discretion.  The People do not suggest a standard of review.]  (*Ibid.*)  Under the substantial evidence test, we review the whole record in a light most favorable to the order denying suppression (*Jenkins, supra,* 22 Cal.4th at p. 969) to determine whether it discloses "evidence '"reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case"'" (*People v. Samuel* (1981) 29 Cal.3d 489, 505).

2.    *Analysis*

The trial court found that up to and including the time at which Pierce made the statement in the parking lot regarding weed she was merely detained, not in custody.  That finding is supported by substantial evidence: McGill was not in uniform; McGill did not display a weapon or handcuffs; the events took place in a public commercial establishment; McGill was the only officer who approached Pierce [Footnote: Although we recognize that the evidence on this point is conflicting, in our review of the record we consider only *the substantiality of the evidence in support of the ruling actually made*, not whether other evidence in the record "'might also be reasonably reconciled with a contrary finding.'"  (*People v. Snead* (1991) 1 Cal.App.4th 380, 384 (sufficiency of evidence in support of ruling on motion to suppress).)]; Pierce was not placed under arrest; and the entire event from McGill's initial contact inside the FedEx store to Pierce's incriminating statement in the parking lot took less than five minutes.

Citing *People v. Manis* (1969) 268 Cal.App.2d 653, Pierce suggests that once McGill "accused (Pierce) of trafficking in cocaine," the stop "went from mere detention to custody."  We disagree.  We do not consider McGill's

question "'If (the box) doesn't have marijuana, is there cocaine in it?'" to be *accusing* Pierce of trafficking in cocaine. Indeed, the authority on which Pierce relies, *Manis,* fully supports our conclusion: "Only when suspicion focuses sharply enough to provide *reasonable cause for arrest or charge* does the relationship between the police and the person detained become that of accuser and accused." (*Id.* at p. 667, italics added.) Here, when Pierce and McGill were in the parking lot, there is nothing to suggest that McGill had reasonable cause to arrest Pierce at the time of his question; thus, there is nothing to suggest that McGill's question was an accusation sufficient for a reasonable person in Pierce's situation to believe she was then in custody. Indeed, as *Manis* reaffirms, the requirement to provide *Miranda* warnings does not affect "'(g)eneral on-the-scene questioning as to facts surrounding a crime.'" (*Id.* at p. 669, quoting from *Miranda, supra,* 384 U.S. at p. 477.)

The trial court's findings are supported by substantial evidence, and our independent review does not disclose any error in the court's application of the appropriate law to the facts.

(Lodgment No. 6, <u>People v. Pierce</u>, No. D068218, slip op. at 7-10.)

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. It has been clearly established for over 50 years that the "Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." <u>Miranda</u>, 384 U.S. at 467; <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964) (holding that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.")

The "privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." <u>Illinois v. Perkins</u>, 496 U.S. 292, 295 (1990). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody . . . .'" <u>Id.</u>, quoting <u>Miranda</u>, 384 U.S. at 444. Custodial interrogation occurs when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983), quoting <u>Oregon v. Mathiason</u>, 429 U.S.

492, 495 (1977).  "Absent such interrogation, there [is] no infringement of the right . . . and there [is] no occasion to determine whether there ha[s] been a valid waiver."  Edwards v. Arizona, 451 U.S. 477, 486 (1981).

Detective McGill testified that he told Petitioner that he had been watching her and that based on his many years of experience he suspected her parcel contained marijuana. (RT 130.)  He said that Petitioner "really didn't say anything.  She kind of shook her head in the 'no' fashion."  (Id.)  Detective McGill then said to her, "Well, whatever is in here, if it's not marijuana, then it's cocaine."  (Id.)  Petitioner replied, "No.  It's a little bit of weed." (Id.)  Petitioner testified that Detective McGill told her, "I've been doing this my whole life, and if it's not weed in there, it's cocaine," but denied making any statement other than giving consent to open the parcel.  (RT 174.)  As quoted above, the appellate court found "there is nothing to suggest that McGill's question was an accusation sufficient for a reasonable person in Pierce's situation to believe she was then in custody."  (Lodgment No. 6, People v. Pierce, No. D068218, slip op. at 10.)  Although Petitioner denied she said there was "a little bit of weed" in the parcel, and disagreed with Detective McGill whether he displayed his firearm, there is no material dispute regarding what Detective McGill said.[2]

"Interrogation" includes not only direct custodial questioning by law enforcement officers, but its "functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  "A functional equivalent of questioning is any statement or conduct which the police should know is 'reasonably likely to elicit an [inculpatory or exculpatory] response from the suspect.'"  Shedelbower v Estelle, 885 F.2d 570, 573 (9th Cir. 1989), citing Innis, 446 U.S. at 301 & n. 5.  "This is not to say, however, that all statements obtained by the

---

[2]  Detective McGill testified at the preliminary hearing motion that it was not a question but a statement: "Well, then if it's not marijuana, it's cocaine."  (Lodgment No. 1, Preliminary Hearing Tr. at 69.)  But at the pre-trial motion in limine hearing he testified, "I said, 'if it doesn't have marijuana, is there cocaine in it?'"  (RT 30.)  He and Petitioner both testified at trial that it was a statement and not a question.  (RT 130, 184.)  Any dispute regarding whether it was a statement or a question is immaterial because, as discussed below, the reference to cocaine, although somewhat accusatory, did not convert the conversation into a custodial interrogation.

17cv0807-LAB (JLB)

police after a person has been taken into custody are to be considered the product of interrogation." Innis, 446 U.S. at 299. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding of Miranda]." Miranda, 384 U.S. at 478 ("The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.")

Even assuming Detective McGill's statement is the "functional equivalent" of interrogation because it is the type of statement that he should have known was reasonably likely to elicit an inculpatory or exculpatory response from Petitioner, the state appellate court reasonably found Petitioner was not in custody at the time. Custodial interrogation occurs when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Beheler, 463 U.S. at 1125, quoting Mathiason, 429 U.S. at 495. The Supreme Court in Mathiason stated:

> Such a noncustodial situation [where there was no indication the questioning took place in a context where the defendant's freedom to depart was restricted in any way] is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.

Mathiason, 429 U.S. at 495.

/ / /

The evidence showed that Petitioner followed Detective McGill outside the FedEx store after McGill identified himself as a police officer and said to Petitioner, "Let's go outside and talk to your friend," took the parcel and walked outside. (RT 128.) Although Detective McGill said Petitioner never saw his gun (RT 138), Petitioner testified that he displayed his gun when he lifted his shirt to show her his badge. (RT 171.) Outside the store Detective McGill told her he had thirty years of experience, that he had been watching

her, and he had reason to believe that her parcel contained marijuana. (RT 130.) Petitioner "really didn't say anything. She kind of shook her head in the 'no' fashion," and Detective McGill told her, "Well, whatever is in here, if it's not marijuana, then it's cocaine," to which Petitioner replied, "No. It's a little bit of weed." (Id.) Detective McGill testified that he asked for her consent to open the parcel, which she gave. (RT 130-31.) He opened the package, found marijuana and arrested her, and the entire encounter took less than five minutes. (Id.) Thus, the only factual disputes were whether Detective McGill displayed his firearm, whether his statement about cocaine was in the form of a statement or a question, and whether Petitioner made her statement. However, the state court correctly found, and it is undisputed, that there were no formal restraints of Petitioner's freedom of movement of any kind, much less to the degree associated with a formal arrest, and that the entire encounter was brief. Further, as the state court also correctly found, to the extent the officer's reference to cocaine had an accusatory message, the officer's suspicion had not ripened into probable cause, the relationship had not become that of accuser and accused, and "thus, there is nothing to suggest that McGill's question [regarding cocaine] was an accusation sufficient for a reasonable person in Pierce's situation to believe she was then in custody." In sum, it was objectively reasonable for the state court to find that "a reasonable person in Pierce's situation [would not] believe she was then in custody." (Lodgment No. 6, People v. Pierce, No. D068218, slip op. at 10.)

Accordingly, the Court finds that Petitioner has failed to satisfy the provisions of 28 U.S.C. § 2254(d)(1) because she has failed to demonstrate that the state court adjudication of claim two is contrary to, or involves an unreasonable application of, clearly established federal law. The Court also finds that Petitioner has failed to satisfy the provisions of 28 U.S.C. § 2254(d)(2) because she has not shown that the factual findings upon which the state court's adjudication of her claim rests are objectively unreasonable. Miller-El, 537 U.S. at 340.

Finally, even if Petitioner could demonstrate an error in admitting her statement, and assuming she could satisfy the provisions of 28 U.S.C. § 2254(d)(1) or (2), habeas relief is

17cv0807-LAB (JLB)

not available if the error is harmless.  Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (holding that Miranda errors are subject to harmless error review).  Under that standard, habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error."  Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) and O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  "There must be more than a 'reasonable possibility' that the error was harmful."  Davis v. Ayala, 576 U.S. ___, 135 S.Ct 2187, 2198 (2015), quoting Brecht, 507 U.S. at 637.

Although Petitioner's statement presented direct evidence that she was aware her parcel contained marijuana, the other evidence against her, even without that statement, was strong.  She flew to San Diego from New York the previous day carrying about $13,000 in crisp new $100 bills, approximately the same amount as the value of the marijuana in San Diego.  Her explanation regarding why she was carrying so much cash was implausible and was apparently rejected by the jury.  In addition, her actions when confronted by the police showed a consciousness of guilt.  She appeared very nervous and kept glancing at White, and even though she testified she and White were friends and she contacted him in order to have him show her around San Diego and help her find an apartment, she was unable to tell the officer his name.  She told the officer she did not know what was in her parcel, despite testifying at trial that White had told her it contained books.  The Court is not left with a "grave doubt" that, assuming the statement was obtained in violation of Miranda, its introduction at trial resulted in a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; O'Neal, 513 U.S. at 436; see also Ayala, 135 S.Ct at 2198 ("There must be more than a 'reasonable possibility' that the error was harmful."), quoting Brecht, 507 U.S. at 637.

The Court finds that the state court adjudication of claim two is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not

17cv0807-LAB (JLB)

based on an unreasonable determination of the facts, and that any error is harmless. Accordingly, the Court recommends denying habeas relief as to claim two. **IV.**

**CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **October 30, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **November 6, 2017.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated: October 16, 2017

Hon. Jill L. Burkhardt
United States Magistrate Judge

17cv0807-LAB (JLB)